15954

PENNELL & HARLEY, INC., v. HARRIS *ET AL.*
(43 S. E. (2d) 490)

*Messrs. Carlisle, Brown & Carlisle,* and *C. Y. Brown,* of Spartanburg, for Appellants, cite:

*Messrs. Odom & Bostick,* and *E. W. Johnson,* all of Spartanburg, for Respondent, John W. Harris, cite:

June 5, 1947.

OXNER, J.: This action was commenced in May, 1940, by Pennell & Harley, Inc., for the purpose of foreclosing two mortgages, covering the same property, which said corporation held as collateral to a $2,750.00 note executed by John W. Harris, Jr., on March 4, 1940. During the pendency of the action the collateral note was paid by John W. Harris, Jr., and the two mortgages delivered to him. On April 28, 1945, an order was passed dismissing Pennell & Harley, Inc., as a party plaintiff and directing that the action be continued for the purpose of adjudicating the issues raised between John W. Harris, Jr., and his sisters and the heirs of a deceased brother. The effect of this order was to substitute John W. Harris, Jr., as plaintiff in said foreclosure proceedings. The two mortgages involved are as follows: (1) Mortgage securing note to John W. Harris, Jr., for $10,183.99, executed by his brothers and sisters on May 15, 1924, payable three months after the death of the last surviving parent, and providing for interest from date at the rate of six per cent per annum. (2) Mortgage securing note to H. B. Carlisle and H. L. Bomar for $10,-968.00, executed by John W. Harris, Jr., and certain of his brothers and sisters on April 5, 1926, payable in annual installments of varying amounts over a period of six years and bearing interest from date at 7% per annum. The interest of the mortgagors in the property consisted of an interest in remainder after a life estate in their parents, since deceased.

The sisters and the estate of a deceased brother answered the complaint, alleging that there was no consideration for the execution of the two notes and mortgages; that they were given for the personal benefit of John W. Harris; and

that he was due his brothers and sisters an accounting as their agent. The precise issues involved can be better understood after we have reviewed the history of the Harris family and the various financial transactions between the members of this family over a long period of years, which will include a statement of the facts leading up to the execution of these two mortgages.

J. West Harris and his wife, Hattie G. Harris, formerly lived on a farm near the City of Spartanburg about where the Southern Railway shops are now located. They had nine children, five boys and four girls. The oldest child was born in 1886 and the youngest in 1902. One of the sons, F. Gentry Harris, who later became a prominent member of the Spartanburg Bar, managed this farm from 1912 to 1920. The income from the farm during this period was insufficient to pay the expenses of operation, family living expenses and the education of the children, so that by 1920 the parents owed approximately $33,000.00, the greater portion of which was unsecured. Very probably the education of the children, most of whom were graduated from college, was the major cause of this indebtedness. During that year at the request of the parents, who were then rather advanced in years, and with the knowledge and consent of the other brothers and sisters, John W. Harris, Jr., assumed management of the farm and continued to manage same from 1920 to 1929. During this period several of the children were attending college and considerable repairs and improvements were made on the farm. Total expenditures exceeded receipts each year until 1927 when for the first time in the history of the place there was no deficit. John W. Harris, Jr., testified that these deficits were paid by him from personal loans and from his salary as a member of the Wofford College faculty. The parents and some of the children continued to reside on the farm. John W. Harris, Jr., kept a detailed record of all financial transactions which was introduced in evidence. In 1929 he relinquished this position and shortly thereafter furnished his brothers and

sisters with a condensed statement of all receipts and disbursements made by him from 1920 to 1929 which disclosed that the indebtedness on the farm had been considerably reduced during his management. No objection was ever made to this accounting by any one prior to the commencement of this action.

In 1920 the farm lands owned by the parents, J. West Harris and Hattie G. Harris, were heavily encumbered. Adjoining these lands there was a tract of 76 acres which was unencumbered and held by J. J. Gentry in trust for Hattie G. Harris for life, with remainder over to her children. On December 5, 1922, the parents and all the children, except one who was then in Africa and unavailable, signed a family agreement. At this time all the children were of age except the youngest child, then 20 years old, who stated that she would ratify same after attaining her majority. This agreement recites that J. J. Gentry, trustee, was empowered under the terms of the deed conveying the 76 acres to him in trust to sell said property and reinvest the proceeds in real estate to be held under the same trust; that Mrs. Hattie G. Harris owned 22.10 acres which was subject to the lien of a mortgage upon which there was due $2,626.56; that J. West Harris owned approximately 18 acres encumbered to the extent of $2,077.95; that F. Gentry Harris held a note of his parents for $3,109.17, executed in December, 1920, at which time he made a complete settlement with his parents and it was found that they owed him this amount "for money advanced by him for the development of the place and education of the younger children", upon which note there was a balance due of $2,328.46; that Hattie G. Harris owed a note to a Spartanburg bank upon which there was due $3,579.01; and that John W. Harris, Jr., since assuming management of the farm, had "advanced from his salary to Mr. and Mrs. Harris for the upkeep of the place and education of the younger children the sum of $3,658.25". The agreement further states: "All these debts were created for the development of the farm and the

education of the younger children and to provide living expenses for the family at home. It is thought wise by us all that if possible these debts should be taken off the shoulders of Mr. and Mrs. Harris so far as possible". After making these recitals, the parties agreed for J. J. Gentry, trustee, to sell 36.74 acres from the 76-acre tract to John W. Harris, Jr., at the price of $11,185.00, and that the purchase price should be used to discharge the first four obligations of Mr. and Mrs. Harris above enumerated and that the balance should be applied on the indebtedness owing to John. W. Harris, Jr., which would leave a balance due him of $3,085.23. In consideration of the payment of these obligations, Mr. and Mrs. Harris agreed to convey to J. J. Gentry, as trustee, the lands owned by them referred to in the agreement, consisting of approximately 40 acres, it being stipulated that the 40 acres to be conveyed to the trustee had been determined by disinterested appraisers to be equal in value to the 36.74 acres conveyed to John W. Harris, Jr. Certain other features of this agreement will be hereinafter referred to.

In May, 1924, eight of the children executed and delivered to John W. Harris, Jr., their brother, a note and mortgage for $10,183.99, which is the first mortgage sought to be foreclosed in this action. John W. Harris, Jr., testified that this amount represented the following items: (1) Advances made by him from 1920 to 1924 aggregating $5,513.57, (2) interest thereon of $554.79, and (3) the assumption and subsequent payment by him of certain notes and mortgages given by his parents on property owned by them in the City of Spartanburg.

In 1925, one of the sons, A. Lyles Harris, executed a mortgage on his interest in remainder in the farm to secure a note of $10,000.00 to H. B. Carlisle and H. L. Bomar. This note was endorsed by the maker's brother, John W. Harris, Jr. A. Lyles Harris defaulted in the payment of the note and the mortgagees proceeded to foreclose. In November, 1925, A. Lyles Harris went into bankruptcy and

in April, 1926, his interest in the property was sold by the trustee in bankruptcy and purchased by his brothers and sisters then living (one of the sons, Carlos G. Harris, having died on March 31, 1926). The funds to secure the purchase price were raised by executing a note on April 5, 1926, to H. B. Carlisle and H. L. Bomar in the sum of $10,968-.00, secured by a mortgage over the same lands covered by the first mortgage. This is the second mortgage sought to be foreclosed in this action. On April 3, 1936, A. Lyles Harris conveyed all of his right, title and interest as an heir-at-law of his brother, Carlos G. Harris, to his brothers and sisters.

On June 28, 1928, seven of the children, who constituted all of the children then living except A. Lyles Harris, entered into a second family agreement. This agreement recites the execution of the mortgage to John W. Harris in 1924 and that same was given to secure the "amount which he had advanced in the improvement of the place and paying interest on indebtedness incurred for the improvement of the place and the education of the younger children"; and that F. Gentry Harris during 1925 and 1926 had paid certain obligations of his mother and made certain advances to her, all of which aggregated approximately $1,800.00. The parties agreed for J. J. Gentry, trustee, to sell to John W. Harris, Jr., a house and lot in the City of Spartanburg for the sum of $6,000.00 to be paid for by crediting the 1924 mortgage held by him with the sum of $4,200.00 and by paying the balance of $1,800.00 to F. Gentry Harris in settlement of the obligations above referred to. It was further stated that the debts which would be paid from the proceeds of sale "were incurred for the improvement of the farm in which we have a remainderman's interest". The agreement further states: "And we further agree that J. J. Gentry, as trustee, be relieved of re-investing the proceeds from said sale in other real estate as is provided in the deed of the property to J. J. Gentry as trustee—we fully understanding and agreeing to the fact that this plan is really

the investment in real estate by paying for improvement made on the real estate which we now own a remainderman's interest in, as fully as if the proceeds were used to purchase other real estate subject to the same trust. And we hereby absolve and exonerate forever the said J. J. Gentry as trustee, his heirs, executors and administrators, from any legal liability to account to us or our heirs, executors or administrators, for the proceeds of said sale; it being clearly understood by each of us—each of us being over twenty-one and of sound mind—that the above mentioned conveyance is made by J. J. Gentry, trustee, only after the execution of this agreement, and in pursuance of this agreement, on our part, together with the consent of our mother, Hattie G. Harris, who signs this agreement with us, and the consent of M. O. Gentry and J. J. Gentry, as executors of the last will and testament of L. M. Gentry, deceased". (It will be recalled that the property held by J. J. Gentry was in trust for the benefit of Hattie G. Harris for life, with remainder over to her children.)

In 1932, John W. Harris, Jr., personally borrowed from a Spartanburg bank the sum of $5,000.00 and pledged as collateral security for the payment thereof the note and mortgage given to him in 1924, along with other notes and mortgages owned by him given by various parties. The Spartanburg bank later was placed in liquidation and John W. Harris, Jr., compromised his indebtedness to the bank and redeemed his collateral. The note and mortgage given by the children in 1926 to H. B. Carlisle and H. L. Bomar (a second mortgage) was sold by the payees to Converse College. The makers defaulted on this paper and some time later John W. Harris, Jr., purchased this note and mortgage from Converse College for the sum of $750.00. In order to raise a portion of the funds used in compromising his indebtedness with the receiver of the Spartanburg bank and the indebtedness held by Converse College, John W. Harris, Jr., borrowed $2,750.00 from the original plaintiff in this case and pledged as collateral both the notes and

mortgages involved in this action. As heretofore stated, the $2,750.00 obligation was paid by John W. Harris, Jr., after this action was commenced and both notes and mortgages were reassigned to him.

The father of these children, J. West Harris, died in 1933, a son, F. Gentry Harris, died in 1935, and the mother, Hattie G. Harris, died in 1939. It is thus seen that only seven of the nine children are now living.

The real contest here is between John W. Harris, Jr., who is asking foreclosure of the two mortgages and is respondent on this appeal, and his four sisters and the estate of the deceased brother, F. Gentry Harris, who are appellants on this appeal. The remaining two children, both sons, defaulted and have not contested the foreclosure proceedings. The appellants allege in their answer to the first cause of action, involving foreclosure of the first mortgage, "that they received no consideration for the execution of the note and mortgage and that same were given for the personal benefit" of John W. Harris, Jr.; that John W. Harris, Jr., purchased this note and mortgage from the receiver of the Spartanburg bank at a large discount and their liability should not exceed the amount paid by him to the receiver; and "that John W. Harris, Jr., was acting as agent and trustee for these defendants in the handling of this matter and as such these defendants are informed and believe that they are entitled to an accounting from him of his acts and doings in connection therewith". They allege in their answer to the second cause of action, involving the foreclosure of the second mortgage, "that they secured no benefit or consideration for the execution" of said note and mortgage and "that same was given for the accommodation of John W. Harris, Jr., F. Gentry Harris and A. Lyles Harris"; that John W. Harris, Jr., had purchased this mortgage from Converse College "at a greatly reduced sum" and that their liability should be limited to the amount paid by him to Converse College. Appellants do not charge that they were

induced to sign either the family agreements or the two mortgages through fraud, undue influence or mistake.

The Master, to whom there was a general order of reference, held that the mortgages were supported by a valuable consideration and that there was "no element of accommodation"; that no attack could be made on the mortgages for lack of consideration because a sealed instrument imports a consideration; that in acquiring the 36.74 acres of land under the family agreement of 1922, John W. Harris, Jr., was not acting as trustee for the family but acquired said property in his own right; "that the accounting made by John W. Harris, Jr., as to his management of the farm, its rents and proceeds, etc., is not only sufficiently comprehensive but entirely adequate"; and "that the mortgage of 1924 is properly denominated a family settlement and a crystallization of the equities which at the time existed in favor of John W. Harris, Jr." The Master concluded "that the mortgages represent security for a valid and subsisting debt, * * * that there was no confidential or fiduciary relationship violated with regards to the mortgages, the deeds or any other related transaction, that the mortgages are respectively first and second liens on the property described and lastly, there was no agency involved in the purchase of the Converse College mortgage". The Master recommended that John W. Harris, Jr., be awarded judgment for the amount of the mortgage debts and that the mortgages be foreclosed and the premises sold.

On appeal to the Circuit Court, that Court sustained the Master's report in every particular except as to the amount John W. Harris, Jr., was entitled to recover on the second mortgage. As to this mortgage, the Court below found that John W. Harris, Jr., had paid interest thereon of $1,517-.88 and had thereafter acquired the note and mortgage for $750.00, making the actual cost to him $2,267.88, and held that John W. Harris, Jr., could not recover more than this amount with interest and that he was entitled to judgment

against each of his co-maker· ·n this note for one-seventh of this amount.

We shall not undertake to discuss *seriatim* the numerous exceptions. The major question raised is that in acquiring the real estate in 1922, in taking the mortgages involved in this action, in reacquiring them after they had .been assigned, and in all other matters John W. Harris, Jr., was acting as "family agent". It is contended that he should therefore be required to account for all profits on the property deeded to him and that "the mortgages belong to all the children jointly". In other words, appellants say that they are entitled to a general accounting and not merely to an accounting for "the management of the farm". It is very doubtful whether some of these questions were raised in their answer. However, we shall proceed to consider them and will discuss the various transactions in their chronological order.

The family agreement executed on December 5, 1922, is devoid of any suggestion that John W. Harris, Jr., was to receive the 36.74 acres of land, which the parties therein authorized to be sold to him, in a fiduciary capacity or as trustee for his brothers and sisters. On the contrary, it shows that he was to acquire said property in his own right. The agreement states that the price was "fixed by ·three disinterested appraisers". It is further stipulated in this agreement: "In consideration of the above stated facts and circumstances, we give our full and free consent for the said J. J. Gentry, trustee, to convey to John W. Harris, Jr., the 36.74 acres above mentioned. We also acquiesce in his reinvestment of the proceeds from said sale in the 40.09 acres above mentioned; and we consider this whole transaction to be for the best interest of all concerned". It is undisputed that from the proceeds of said sale John W. Harris, Jr., paid the various obligations of his mother and father enumerated in this agreement. This instrument was carefully drawn by one of the sons, F. Gentry Harris, a capable lawyer. If the property was to be held by John W. Harris,

Jr., in trust for his brothers and sisters, it is difficult to perceive why the draftsman failed to insert such an important provision. It is true that two of the appellants testified that John W. Harris, Jr., told them that if he realized any profits on this tract, such profits would be turned over to his mother or her estate. These witnesses were unable to say whether this conversation occurred before or after the conveyance to John W. Harris, Jr. Assuming that this testimony was admissible, it is not corroborated by any of the other children, it is denied by respondent and his brother, and is inconsistent with the terms of the 1922 family agreement. Shortly after acquiring this 36.74 acre tract, John W. Harris, Jr., purchased from his father an adjoining tract of 22.70 acres at the same price per acre which he paid for the 36.74 acre tract. Appellants claim that in purchasing this tract, John W. Harris, Jr., was also acting as trustee for his brothers and sisters, but offered no testimony to sustain such a contention.

A little over a year after buying these two tracts, John W. Harris, Jr., sold to the Southern Railway Company the 22.70 acre tract purchased from his father and realized a profit of approximately $6,000.00 and also sold to the Southern Railway Company approximately 29 acres from the 36.74 acre tract at a profit of approximately $7,000.00. The balance of the 36.74 acre tract was sold by him to his brother, F. Gentry Harris, and he received no profit on this transaction. This property was acquired by the Southern Railway Company in connection with its program to locate its railroad shops near the City of Spartanburg. It is very doubtful whether such a large profit would have been realized by John W. Harris, Jr., except for this fortuitous circumstance. He testified positively that when acquiring the property, he knew nothing of any plan to locate the railroad shops in this area and there is no testimony that any one else in this vicinity had such knowledge. The father lived approximately 10 years after this transaction. He never complained of the profits realized by the son on the

land which he deeded to him. There is no evidence that any of the children, prior to the commencement of this action, ever made any claim on John W. Harris, Jr., for any portion of the profits realized on the sale to the Southern Railway Company.

The Master and the Circuit Judge were entirely correct in holding that John W. Harris, Jr., acquired this property in his own right and that appellants were not entitled to an accounting for the profits which he received.

■ We next consider the transaction in May, 1924, involving the execution of the first mortgage. The testimony heretofore mentioned of John W. Harris, Jr., relating to the items making up the amount of this mortgage is uncontradicted. The agreement of December 5, 1922, recites that there was a balance then due John W. Harris, Jr., of $3,085.23 which he had advanced "for the upkeep of the place and the education of the younger children". According to the testimony of John W. Harris, Jr., when this mortgage was executed the aggregate amount of these advances, including interest, had increased to $6,068.36. The consideration for the remaining amount of this mortgage consisted of the assumption by John W. Harris, Jr., of certain notes and mortgages of his parents. It is conceded that the obligations as assumed were subsequently paid by John W. Harris, Jr. Appellants' contention is that they were not paid with his personal funds but "out of the family account". In support of this contention, appellants call our attention to certain isolated statements in the testimony of John W. Harris, Jr., which are seemingly contradictory of other testimony given by him. This is rather natural in view of the fact that he was cross-examined at great length and was undertaking to testify as to transactions which occurred 15 or 20 years previously. Consideration of all of his testimony fully justifies the conclusion of the Master and Circuit Judge that he personally paid the obligations which he assumed. Moreover, appellants' answer sets up a plea of absence of consideration and not a

plea of partial failure of consideration. In addition to this, the agreement of 1928, in the execution of which appellants joined, recites the execution of this mortgage and directs that from the proceeds of the property therein authorized to be sold there shall be credited on this mortgage the sum of $4,200.00. If appellants thought at that time that this mortgage did not represent valid, subsisting indebtedness to their brother, why did they sign this agreement? No explanation is offered in the testimony. The testimony is undisputed that this mortgage was not executed at the request of John W. Harris, Jr., but was prepared and the amount thereof determined by his brother, F. Gentry Harris, who did all the legal work for the family. There was no reason whatsoever for this mortgage to be held by John W. Harris, Jr., for the benefit of his brothers and sisters, as the consideration was paid entirely by him and there is nothing in the record to show that appellants ever made any advances to the family. We find it unnecessary to pass upon the other grounds upon which the lower Court upheld the validity of this mortgage.

We are also of opinion that there is no merit in appellants' contention that respondent was acting as agent for the family in compromising his indebtedness to the receiver of the Spartanburg bank. The note held by the receiver was respondent's personal obligation. There was no occasion for him to be acting for any one else in compromising his own indebtedness. When he settled with the receiver, he was entitled to the collateral pledged to secure the indebtedness. It is true that two of the appellants testified that respondent said that his negotiations with the receiver would be for the benefit of the whole family, but these witnesses admitted on cross-examination that this was subject to each of the children paying a certain amount to respondent, which admittedly was never done. The other appellants, although apparently present when this alleged conversation occurred, did not testify. The testimony of respondent and one of his brothers is to the effect that there

never was any understanding that respondent's dealings with the receiver were in behalf of the family.

As to the second mortgage, the note and mortgage compromised was the joint obligation of respondent and his brothers and sisters. Under the ruling of the lower Court, from which there has been no appeal, appellants were given the benefit of the discount at which the second note and mortgage were purchased by respondent and each of the makers was only held liable for his *pro rata* part of the amount actually paid by respondent to Converse College. Appellants construe the decree as holding the makers jointly liable for this amount. The decree in this respect is somewhat ambiguous but there being no objection from respondent, it will be construed as only holding the makers severally liable. Finally, appellants say that equity should not allow contribution. They argue that the second note and mortgage constituted a substitution for the original note and mortgage of A. Lyles Harris, upon which respondent alone was endorser and that respondent received an unfair advantage in the execution of the second note and mortgage. But there is no allegation or proof of fraud or mistake. Presumably appellants knew this when they received deed to the interest of A. Lyles Harris and executed the second note and mortgage. They freely and voluntarily entered into this obligation. We might further add that the controversy as to the second note and mortgage is not very material, as the parties apparently concede that the premises will not bring in excess of the amount due on the first note and mortgage.

It is lastly contended that the Court erred in awarding a deficiency or personal judgment against appellants for the amount due on the two notes and mortgages foreclosed. Respondent states that he is agreeable to the decree being modified so as to relieve appellants from any liability for a deficiency judgment. It is accordingly so modified.

The judgment of the lower Court is affirmed except as to the modification contained in the preceding paragraph which relieves appellants of any liability for a personal or deficiency judgment.

BAKER, CJ., and FISHBURNE and STUKES, JJ. concur.

TAYLOR, J., did not participate.